IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| vs. | * | Criminal No.: CCB-16-0597 |
| | * | |
| MONTANA BARRONETTE | * | |

\* \* \* \* \* \* \* \* \*

**MOTION IN LIMINE TO EXCLUDE FIREARMS IDENTIFICATION
ON THE BASIS OF SCIENTIFIC INVALIDITY**

Now comes the Defendant, Montana Barronette, by his attorneys, Alan R. L. Bussard, Esq. Michael Lawlor, and Nicholas Madiou, and moves this Court to prohibit the introduction of any testimony that a "match" between cartridge casings discovered in the course of this case can be concluded within a reasonable degree of scientific certainty. Furthermore, the Defendant requests a hearing on this matter under the authority of *Daubert v. Merrell Dow Pharmaceutical Co.*, 509 U.S. 579 (1993) and F.R.E. 702. In support he states:

**Background**

The defendant is charged in a superseding indictment with Conspiracy to Commit Racketeering Acts, in violation of 18 U.S.C. § 1962(d); Violent Crimes in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1); and Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846.

A review of the voluminous discovery materials provided to date by the government as well as documents and information received as a result of counsel's investigation reveals that a significant portion of the government's case will focus on the alleged identification and "linking"

of certain shell casings and projectiles recovered at the scenes of various homicides over the course of law enforcement's investigation extending back to at least 2014.

    1. On December 14, 2016, a federal grand jury returned an indictment charging six members of what the government characterizes as a violent gang labeled as "Trained to Go" ("TTG") with conspiracy to distribute narcotics, in violation of 21 U.S.C. § 846 and related charges. On June 29, 2017, a federal grand jury returned a superseding indictment charging twelve members of what the government characterizes as a violent gang labeled as "Trained to Go" ("TTG") with conspiracy to commit racketeering in violation of 16 U.S.C. § 1962(d) and related charges. Finally, on June 7, 2018, a federal grand jury returned a second superseding indictment charging ten members of what the government characterizes as a violent gang labeled as "Trained to Go" ("TTG") with conspiracy to commit racketeering in violation of 16 U.S.C. § 1962(d) and related charges. Trial is set for September 17, 2018.

    2. Mr. Barronette had his initial appearance on January 6, 2017 and soon after, undersigned counsel entered into a discovery letter agreement. Pursuant to the discovery agreement, the government has made eight (8) discovery productions.

    3. Trial is set for September 17, 2018.

    4. On August 16, 2018, the government produced a correspondence referencing its intended expert disclosures. In pertinent part, those disclosures included the following:

> Baltimore City Police Department Firearms and Toolmark Examiner James Wagster and Chris Faber. The government expects to call James Wagster and Chris Faber and qualify both individuals as experts in the field of firearms, toolmarks and ballistics analysis and comparisons. Mr. Wagster and Mr. Faber are currently firearms and toolmark examiners for the BPD. Mr. Wagster and Mr. Faber analyze ballistics evidence and compares casings, bullets, bullet fragments, and firearms as part of their routine duties. Mr. Wagster and Mr. Faber conducted forensic comparisons or assisted in forensic comparisons in the following cases: (1) the 9mm

casings recovered from the triple murder on July 7, 2015 were determined to have been fired from the SCCY 9mm firearm seized on or about January 28, 2016 (**reports – 3116**); (2) the casings recovered from the murder of Christopher Jackson on May 25, 2016 were determined to have been fired from the same firearm used during the non-fatal shooting of Jackson on May 10, 2016 (**reports – 1297**); (3) the 9mm casings recovered from the Dominique Harris murder on December 28, 2015 were determined to have been fired from the same SCCY 9mm firearm recovered on or about January 28, 2016 (**reports – 1753**); (4) the .40 caliber casings recovered from the Dominique Harris murder were determined to have been fired from the same firearm as the .40 caliber casings discovered at the David Moore murder on November 8, 2015 (**reports – 3560**). The government anticipates that Mr. Wagster and Mr. Faber will testify concerning their methodology for comparing ballistics evidence and the basis for their conclusions in this case. Mr. Wagster and Faber's *curriculum vitae* is attached. Copies of Mr. Wagster and Faber's reports are also attached.

6. Baltimore City Police Department Firearms and Toolmark Examiner Victor Meinhardt. The government expects to call Victor Meinhardt and qualify Mr. Meinhardt as an expert in the field of firearms, toolmarks and ballistics analysis and comparisons. Mr. Meinhardt is currently a firearms and toolmark examiner for the BPD. Mr. Meinhardt analyzes ballistics evidence and compares casings, bullets, bullet fragments, and firearms as part of his routine duties. Mr. Meinhardt conducted forensic comparisons of casings recovered from the scene of the murder of Christopher Pennington on January 9, 2017 and determined that those casings were fired from a Smith & Wesson SW40VE .40 caliber handgun discovered at a residence at 625 Augusta Avenue on January 10, 2017 (**reports – 3488**). The government anticipates that Mr. Meinhardt will testify concerning his methodology for comparing ballistics evidence and the basis for his conclusions in this case. Mr. Meinhardt's *curriculum vitae* is attached.

**Please note, we have disclosed all reports related to all firearm comparisons conducted in the homicides related to this case. [1]The government, however, only intends to offer evidence of the above described comparisons.**

5. Included in the discovery materials produced by the government are the voluminous Baltimore Police Department files on at least 16 homicides that the government contends are

---

[1] The defense disputes the government's assertion that it has disclosed all firearm comparisons conducted in the referenced homicides. The records disclosed to date are mere summaries of the examiner's conclusions and include no photographs, notes, bench test results and other documentation to support their conclusions. Despite repeated requests for such documentation and promises that such items will be forthcoming, none have been produced.

3

attributable to the charged defendants. Interspersed with these papers are other documents which are represented to be reports prepared by the Firearms Examiners, Sandra M. Bohlen, Victor Meinhardt, Karen Sullivan, Christopher Faber, and James Wagster, and others, in which they each make various conclusions.

6. The government has provided only the barest summary of the examiner's conclusions but nothing at all as to the bases of fact on which this opinion is based, nor the examiner's qualifications.

7. The government has not provided any other documents to support these intended conclusions.

8. Presumably, when such disclosures are made and during trial, the government will seek to introduce testimony concerning their examinations and findings, and will have their witnesses to declare there is a "match" to a reasonable degree of scientific certainty.

9. Counsel for the Defendant knows no more details about the witness, the examination, or the conclusions because the Government has not provided any more information than what is included in Paragraph 3 above.

**ARGUMENT**

Magistrate Judge Paul Grimm set forth the analytical framework for pretrial assessment of expert opinions:

> The Federal Rules of Evidence charge the district court with determining "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence," Fed. R. Evid. 104(a), such as the question of admissibility under Fed. R. Evid. 702. The Court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). Rule 702 provides indicia of reliability for the district court to consider:

4

> "(1) [whether] the testimony is based upon sufficient facts or data, (2) [whether] the testimony is the product of reliable principles and methods, and (3) [whether] the witness has applied the principles and methods reliably to the facts of the case."

Grimm, Report and Recommendation, *United States v. Willock*, et al, ELH-08-086, ECF Paper 721 at p. 23 ("Grimm Report"). (See Exhibit Five - parts 1-2 - attached hereto)

The Government's Rule 16(a)(1)(G) disclosure, to date, provides none of the bases for the experts' opinions and simply does not permit this Court to even begin the Rule 702 assessment. The disclosure provides no facts, data, principles applied or any of the required indicia of reliability. The testimony should be precluded based on this Rule 16 failure and the consequent failure of the proffered testimony to meet the Rule 702 standards.

Nor does the disclosure allow for any proper assessment required by *Daubert*. Again, to quote Judge Grimm's recent Report in this case:

> As explained in Daubert, a district court assesses whether proffered scientific, specialized, or technical evidence meets the requirements of relevance, reliability, helpfulness, and fit by considering five non-exclusive factors: (1) "whether a theory or technique ... can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether the theory or technique has gained " 'general acceptance' " in the "relevant scientific community." Id. at 593-94 (citation omitted).

Grimm Report, *United States v. Willock*, et al, ELH-08-086, ECF Paper 721, at p. 24.

Judge Grimm applied these principles in addressing expert testimony in the area of firearm toolmark identification. Although the specific references in *Daubert* to science do not technically apply to an expert who purports to testify from a non-scientific basis, "the basic requirements of reliability - as they are now articulated in Rule 702 - apply across the board to all

5

expert testimony..." *United States v. Glynn*, 578 F.Supp.2d 567, 570 (S.D.N.Y. 2008) and Grimm Report at p. 24. *Kumho Tire* provides that the Court's "gatekeeping requirement" as mandated by *Daubert* applies to non-scientific experts as well: "The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. "The focus, of course, must be solely on the principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

In the case of *United States v. Glynn*, 578 F.Supp.2d 567 (SDNY, 2008), that court stated, "Based on the *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993) hearings this Court conducted ..., the Court very quickly concluded that whatever else ballistics identification analysis could be called, it could not fairly be called "science." *Id.* at 570. In a footnote, the *Glynn* court continued, "Although ballistics examiners continue to assert, as do their manuals and literature, that "scientific principles" underlie the field, neither of the Government's witnesses in *Glynn* and *Brown* was able to identify those principles. *See, e.g.*, tr. 6/30/08, at 880. The Court suspects that they consist of no more than those elementary principles of physics that govern the transfer of impressions to a bullet and casing when a gun is fired." Id.

The *Glynn* case built on decisions in prior cases. Thereafter three federal judges have addressed the scientific status vel non of ballistics identification testimony, and all three have concluded that, in one respect or another, it does not have sufficient rigor to be received as science. *See United States v. Monteiro*, 407 F.Supp.2d 351, 355 (D.Mass.2006) (Saris, J.) (finding that while the underlying principles behind firearm identification may be scientifically

valid, "there is no reliable ... scientific methodology which will currently permit the expert to testify that [a casing and a particular firearm are] a 'match' to an absolute certainty, or to an arbitrary degree of statistical certainty."); also *see United States v. Green*, 405 F.Supp.2d 104, 120-22 (D.Mass.2005) (Gertner, J.) (discussing ways in which ballistics evidence fails to meet Daubert criteria regarding, inter alia, testability, reliability, and error rates); also *see United States v. Diaz*, No. 05-167, 2007 WL 485967, at *11-12, 2007 U.S. Dist. LEXIS 13152, at *35-36 (N.D.Cal. Feb. 12, 2007) (Alsup, J.) (citing Monteiro's conclusion that no scientific methodology exists to support a finding of a match to an absolute certainty, but permitting testimony "to a reasonable degree of ballistic certainty").

After an exhaustive examination of the case law on firearms examination and expert opinion testimony, Judge Grimm concluded, in pertinent part, as follows:

(1) That Sgt. Ensor not be allowed to opine that it is a "practical impossibility" for any other firearm to have fired the cartridges other than the common "unknown firearm" to which Sgt. Ensor attributes the cartridges;

(2) Additionally, that Sgt. Ensor only be permitted to state his opinions and bases without any characterization as to degree of certainty (whether "more likely than not" or "to a reasonable degree of ballistic certainty");

(3) Alternatively, if you disagree with Recommendation No. 2, that Sgt. Ensor only be allowed to express his opinions "more likely than not";

(4) Alternatively, if you disagree with Recommendation Nos. 2 and 3, that Sgt. Ensor only be allowed to express his opinions "to a reasonable degree of ballistic or technical certainty" (or any other version of that standard);

7

Grimm Report, *United States v. Willock*, et al, ELH-08-086, ECF Paper 721, at p. 57.

If permitted a *Daubert* hearing, the defense will demonstrate that comparisons of cartridge casing-to- cartridge casing are unreliable, scientifically invalid, and not admissible.

6. The firearms identification evidence in this case will be key. If a laboratory technician is allowed to testify that a "match" exists between these cartridge cases to any degree of certainty, their expertise will have an overbearing effect on the jury. Such is the insight of *Daubert* and the changes made to F.R.E. 702 in 2000. That is, science carries great weight in a courtroom, and the court has a heavy responsibility as a gatekeeper to ensure that only real science — and not "junk science" – is permitted to enter its doors.

WHEREFORE, the Defendant requests a Daubert hearing on the proposed evidence. In the alternative, the defense requests that any opinion testimony presented by the government from firearms examiners be limited as recommended by Judge Grimm, hereinabove.

                                                              Respectfully submitted
                                                               /s/
                                                    _____

                                                    Alan R. L. Bussard
                                                    101 East Chesapeake Avenue, Ste. 200
                                                    Towson, Maryland 21286
                                                    410-821-1155
                                                    Attorney for Defendant

                                                               /s/
                                                  _____

                                                    Michael Lawlor, Esquire
                                                    Nicholas Madiou, Esquire
                                                    Brennan, McKenna & Lawlor, Chartered
                                                    6305 Ivy Lane, Suite 700
                                                    Greenbelt, MD 20770
                                                    301.474.0044

**REQUEST FOR HEARING**

Pursuant to Rule 105.6 of the local rules of the United States District Court for the District of Maryland, a hearing is requested on the Defendant's Motion.

/s/
_____
Alan R. L. Bussard

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of August, 2018, the foregoing Motion in Limine to Exclude Evidence of Firearm Identification (Daubert) was electronically filed with the Clerk of the United States District Court using CM/ECF, with a notice of said filing to the following:

Daniel Gardner, Esquire
Christopher Romano, Esquire
Assistant U.S. Attorney
36 S. Charles Street, Fourth Floor
Baltimore,, Maryland 21201

/s/
_____
Alan R. L. Bussard
Attorney for Defendant